IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DAVID M. ACOSTA<br><br>               PLAINTIFF,<br>v.<br><br>PRINCE GEORGE'S COUNTY, MARYLAND<br><br>PRINCE GEORGE'S COUNTY POLICE DEPARTMENT<br><br>MALIK AZIZ, individually<br><br>TERRANCE NELSON, individually<br><br>LIDIA RAMOS-CEDILLO, individually<br><br>               DEFENDANTS. | CIVIL ACTION No.:  8:25-cv-00055<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

NOW COMES the Plaintiff, David M. Acosta, by and through his attorney, Ray M. Shepard and The Shepard Law Firm and pursuant to the United States Constitution, 42 U.S.C. §§ 1983, 1988, and 2000e, and the Maryland Declaration of Rights, and does hereby sue the Defendants, Prince George's County, the Prince George's County Police Department, Malik Aziz ("Aziz"), Terrance Nelson ("Nelson"), and Lidia Ramos-Cedillo ("Ramos"), for violations of his rights guaranteed by the United States Constitution, federal law, and the Maryland Declaration of Rights.  In support of his causes of action, Plaintiff alleges as follows:

## PARTIES

1. Plaintiff David M. Acosta is a citizen of the United States residing in Waldorf, Charles County, Maryland. Plaintiff Acosta was at all relevant times a police officer in the Prince George's County Police Department employed by Prince Georges County, Maryland. He was at all relevant times assigned to the K-9 Unit.

2. Defendant Prince George's County is a municipal corporation and body politic located in Prince George's County, Maryland. Pursuant to the Prince George's County Charter, § 101, Prince George's County has all rights and powers of local self-government and home rule. Prince George's County maintains and operates a police force, known as the Prince George's County Police Department. Police officers with the Prince George's County Police Department are employees of Prince George's County. Prince George's County has *respondeat superior* liability for Plaintiff's State Constitutional claims.

3. Defendant Prince George's County Police Department (the "PGPD") is the police force maintained and operated by Prince George's County, Maryland.

4. Defendant Malik Aziz was at all relevant times the Chief of Police in the PGPD. Defendant Aziz is the ultimate approval authority within the PGPD for disciplinary actions initiated within the police department. Aziz is sued in his individual capacity as an officer within the police department.

5. Defendant Terrance Nelson was at all relevant times a police officer in the Prince George's County Police Department. Defendant Nelson served as Plaintiff Acosta's supervisory Lieutenant in the K-9 section of the PGPD. Nelson is sued in his individual capacity as an officer within the police department.

6. Defendant Lidia Ramos-Cedillo was at all relevant times a police officer in the Prince George's County Police Department. Ramos served as a member of the Special

Investigation Response Team within the Internal Affairs division of the PGPD. Ramos is sued in her individual capacity as an officer within the police department.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over Plaintiff's Federal Constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343(a), and 42 U.S.C. § 1983.

8. This Court has supplemental jurisdiction over Plaintiff's State Constitutional claims pursuant to 28 U.S.C. § 1367(a).

9. Proper notice of this action was provided to the Prince George's County Attorney in accordance with Md. Cts. & Jud. Proc. Code § 5-304(b). **Exhibit 1.**

10. Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because multiple Defendants reside in the district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

11. Acosta, an honorably discharged United States Marine, began his employment with the PGPD on July 10, 2006. Acosta has provided exemplary service to the PGPD for the past 18 years.

12. For nearly the past decade, Acosta has served within the K-9 unit of PGPD. Acosta has two K-9 partners, Spartacus (a Belgian Malinois owned by the PGPD) and Daisy (a Bloodhound personally owned by Acosta). At all times relevant, Spartacus and Daisy lived with Acosta at his residence in Waldorf, Charles County, Maryland.

13. Defendant Nelson joined the K-9 unit in or about October 2022 as a Lieutenant in the section. At this point, Acosta was a 16-year veteran officer who had never experienced any problems within the K-9 unit, even though he was the only Hispanic officer in the K-9 unit.

14. Acosta began to experience hostility at work from Defendant Nelson soon after Nelson came to the K-9 Unit.

15. A pattern and practice of unequal treatment of Acosta by Nelson quickly developed. Nelson consistently subjected Acosta to a frequency of allegations and levels of discipline that similarly situated non-Hispanic officers were not subjected to for comparable or even worse incidents.

16. By way of example only, on or about March 2023 Nelson used an incident involving a missing person case to inappropriately admonish Acosta in-writing.

17. As another example, on April 23, 2024, Nelson used Acosta's use of force via K-9 to mischaracterize Acosta's use of force and to disparage Acosta with other supervisors in the K-9 Unit.

18. The next day, April 24, 2024, Acosta filed an inquiry with the EEOC via their website concerning race discrimination by Nelson, and on or about May 7, 2024, Acosta received notice of requested interview from EEOC investigator, Erica Adhikary. Acosta was interviewed by Ms. Adhikary on or about May 19, 2024, and several others within his K-9 Unit were also interviewed around the same time. A formal Charge of Discrimination was later filed with the EEOC on September 25, 2024, and Amended on October 3, 2024.

19. Upon information and belief, Nelson and Internal Affairs learned of the EEOC investigation regarding Nelson's treatment of Acosta and Ms. Adhikary's interviews of Acosta and others in or about May 2024.

20. On Sunday July 14, 2024, Acosta had an argument with his girlfriend. After Acosta dropped his girlfriend off at her residence, she called the police. Because the call involved a police officer, Internal Affairs was notified.

21. Defendant Ramos responded to Acosta's girlfriend's residence and forced her way into the residence, threatening Acosta's girlfriend and stating to her falsely that she was required to cooperate with Ramos's investigation of Acosta.

22. Acosta's girlfriend initially made false allegations of domestic violence against Acosta, but later recanted her statements on her own, informing officers within the PGPD that she had "made up" her allegations of domestic violence.

23. Acosta was suspended with pay on July 14, 2024. Upon information and belief, Ramos asked two K-9 officers, Sgt. Green and Sgt. Peters, to go to Acosta's residence in Waldorf, Charles County, Maryland and retrieve Spartacus and Daisy.

24. Ramos was waiting at the PGPD dog kennel for Sgt. Green and Sgt. Peters to return with Spartacus and Daisy. Both K-9s appeared to have "hot spots" around their neck area where they wore e-collars.

25. Following Daisy's visit to a veterinarian on July 15, 2024 and Spartacus's visit to a veterinarian on July 16, 2024, Ramos conducted a short "investigation" which consisted of Ramos's consultation with PG County's Animal Services Division and the K-9's e-collar manufacturer. Ramos did not interview Acosta, did not interview other K-9 officers, and did not interview any PGPD K-9 trainers. Nor did Ramos investigate the PGPD's purchase of, and use of the e-collars Daisy and Spartacus wore, nor did she inspect other K-9's within the PGPD K-9 Unit for similar hot spots.

26. On July 24, 2024, Acosta's girlfriend and her sister, who was present when Ramos arrived at the residence on July 14, 2024, each filed on their own volition a written complaint with the PGPD regarding Ramos's behavior on July 14, 2024. Upon information and belief, Ramos learned about these complaints soon after they were filed with the PGPD.

27. Ramos soon thereafter presented her investigation to Assistant State's Attorney Joel Patterson for "screening" and consideration of criminal charges against Acosta for what Ramos claimed was animal cruelty. ASA Patterson declined to seek criminal charges against Acosta and informed Ramos that she lacked sufficient evidence to establish probable cause to believe Acosta had committed any criminal misconduct.

28. In a highly unusual move, and against PGPD policy, Ramos disregarded ASA Patterson's screening of the case and applied herself for criminal charges against Acosta by completing an Application for Statement of Charges and presenting it to a Commissioner on July 31, 2024.

29. As a result of the Application for Statement of Charges Ramos filed on July 31, 2024, Acosta was charged criminally with three counts, including a felony for abuse of a law enforcement animal, all of which related to Daisy (who was owned by Acosta, not the PGPD).

30. On that same day, July 31, 2024, Ramos suspended Acosta without pay in writing considering the criminal charges she herself applied for and received.

31. On August 1, 2024, Ramos returned to the Commissioner and filed a second Application for Statement of Charges. As a result, Acosta was charged criminally with three additional counts, including a second felony for abuse of a law enforcement animal, all of which related to Spartacus.

32. As the Chief of Police, Defendant Aziz was aware of and approved or acquiesced in Ramos's pursuit of criminal charges against Acosta notwithstanding the State's Attorney's Office declination and stated opinion that Ramos lacked sufficient evidence of any criminal conduct by Acosta.

33. As evidence of his knowledge and approval, Chief Aziz spoke about the charges against Acosta at a televised news conference on or about August 1, 2024. During his public statements to the news media, Defendant Aziz disparaged Acosta, proclaiming his "disgust" with Acosta and calling Acosta's behavior "appalling." Aziz further stated the dog e-collars were "not authorized" by the department and Acosta had wrongfully used them when, in fact, the PGPD had procured the e-collars, issued them to K-9 handlers, and routinely used them with the department's K-9 force. The unfounded criminal charges combined with Aziz's public condemnation of Acosta caused immediate and irreparable harm to Acosta's reputation and standing, both within the PGPD and in the community.

34. In her applications for Statement of Charges against Acosta, Ramos made several intentionally false or misleading statements. Ramos intentionally omitted that both Spartacus and Daisey were in Waldorf, Charles County, Maryland, not in Prince George's County. To conceal this jurisdictional short-coming, Ramos listed the place of the incident to be "13409 Dille Drive, Upper Marlboro, Maryland," the address for the K-9 training facility, instead of Acosta's home address in Waldorf, Charles County, Maryland. Ramos knew Daisy and Spartacus lived in Charles County with Acosta, and never lived at the 13409 Dille Drive address during the period charged by Ramos. This was a critical and intentional misrepresentation by Ramos, who claimed animal cruelty because Spartacus and Daisey allegedly wore the e-collars excessively—conduct she very well knew occurred, if at all, in Charles County, not in Prince George's County. Ramos had no probable cause to believe the alleged criminal neglect or abuse occurred in Prince George's County and actively concealed this from the Commissioner by indicating the abuse and neglect occurred at the K-9 training facility in Prince George's County. Ramos also listed police headquarters as

7

Acosta's home address, rather than provide his actual address where Daisy and Spartacus lived with Acosta.

35. Acosta faced criminal charges, possible incarceration, and remained suspended without pay for 79 days until all of the criminal charges were dismissed on October 18, 2024.

COUNT I
FIFTH & FOURTEENTH AMENDMENTS
STIGMA PLUS CLAIM
42 U.S.C. § 1983
(Acosta v. Aziz and Ramos)

36. Plaintiff incorporates the previous allegations in paragraphs 1 through 35 as if restated herein verbatim.

37. Federal law imposes liability on anyone who, under the color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. As set forth herein, the Defendants acting under color of state law deprived Plaintiff of rights, privileges, or immunities protected by the Fifth and Fourteenth Amendments of the United States Constitution.

38. The Fifth and Fourteenth Amendments to the United States Constitution prohibit the government from depriving Plaintiffs of "life, liberty, or property" without due process of law. "The Supreme Court has acknowledged a constitutional liberty interest in one's reputation." *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021)(citing *Kerry v. Din,* 576 U.S. 86, 91-92 (2015)). A plaintiff claiming reputational injury "must show [(1)] a statement 'stigmatizing his good name' and damaging his standing in the community; (2) some type of dissemination or publication of the statement; and (3) some other government action that 'alter[s] or extinguishe[s] one of his legal rights." *Id.* (quoting *Paul v. Davis,* 424 U.S. 693, 706-711 (1976)).

39. As more particularly described herein Ramos and Aziz made, caused to be made, and/or approved of multiple false statements, misrepresentations, and false reports to a Prince George's County Commissioner designed to convince the Commissioner to charge Acosta with multiple criminal offenses, including two felonies, without probable cause to believe that the alleged criminal conduct occurred in Prince George's County, and without probable cause to believe Acosta had committed any crime. In doing so, Defendants acted with actual malice towards the Plaintiff in that Defendants' actions properly may be characterized by evil or wrongful motive, an intent to injure, knowing and deliberate wrongdoing, and ill will towards the Plaintiff

40. On or about August 1, 2024, Defendant Aziz publicly humiliated and disparaged Acosta during a televised news conference in which Aziz described the criminal charges against Acosta as "appalling" and expressed his own personal "disgust" with Acosta.

41. Plaintiff's constitutionally protected liberty interest in his reputation under the Fifth and Fourteenth Amendments to the United States Constitution was severely and permanently damaged.

42. In addition to the public campaign to stigmatize and humiliate the Plaintiff, the Plaintiff suffered suspension without pay for nearly three months, loss of benefits and related financial opportunities, which caused an immediate and severe hardship in Acosta's ability to care for and meet the financial needs of his family.

WHEREFORE, Plaintiff demands economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by 42 U.S.C. § 1988.

COUNT II
ARTICLE 24 OF THE MARYLAND DECLARATION OF RIGHTS
STIGMA PLUS CLAIM
(Acosta v. Aziz, Ramos, Prince George's County, and PGPD)

43. Plaintiff incorporates the previous allegations in paragraphs 1 through 42 as if restated herein verbatim.

44. Article 24 of the Maryland Declaration of Rights is the Maryland counterpart to the due process clauses found in the Fifth and Fourteenth Amendments to the United States Constitution and are in *pari materia* with its federal counterparts. *Allmond v. Dep't of Health & Mental Hygiene,* 448 Md. 592, 609 (2016).

45. Prince George's County and/or the Prince George's County Police Department have *respondeat superior* liability for Defendants Aziz's and Ramos's violations of Plaintiff's rights secured by Article 24 of the Maryland Declaration of Rights.

WHEREFORE, Plaintiff demands economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by law.

COUNT III
FIFTH AND FOURTEENTH AMENDMENTS
EQUAL PROTECTION
42 U.S.C. § 1983
(Acosta v. Nelson)

46. Plaintiff incorporates the previous allegations in paragraphs 1 through 35 as if restated herein verbatim.

47. Federal law imposes liability on anyone who, under the color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. As set forth herein, the Defendant acting under color of state law

deprived Plaintiff of rights, privileges, or immunities protected by the Fifth and Fourteenth Amendments of the United States Constitution.

48. The Equal Protection Clauses of the Fifth and Fourteenth Amendments of the United States Constitution prohibit the government from subjecting its employees to disparate treatment in the terms or conditions of their employment or in taking adverse employment actions based on race or color.

49. Plaintiff Acosta is Hispanic, and the only Hispanic officer assigned to the PGPD K-9 Unit.

50. As described more fully herein, Plaintiff was subjected to disparate treatment in the terms or conditions of his employment and in taking adverse employment actions, including but not limited to administrative punishments. In taking these actions, Defendants acted with actual malice towards the Plaintiff in that Defendants' actions properly may be characterized by evil or wrongful motive, an intent to injure, knowing and deliberate wrongdoing, and ill will towards the Plaintiff.

WHEREFORE, Plaintiff demands economic, noneconomic, and punitive damages against the aforesaid defendant, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by 42 U.S.C. § 1988.

## COUNT IV
### ARTICLE 24 OF THE MARYLAND DECLARATION OF RIGHTS
### EQUAL PROTECTION
(Acosta v. Nelson, Prince George's County and PGPD)

51. Plaintiff incorporates the previous allegations in paragraphs 1 through 35 and 46 through 50 as if restated herein verbatim.

52. Although the Maryland Constitution contains no express equal protection clause, it is settled that the Due Process Clause of the Maryland Constitution, contained in Article 24 of the Declaration of Rights, embodies the concept of equal protection of the laws to the same extent as the Equal Protection Clause of the Fourteenth Amendment. *Myong Nam Kim v. Bd. of Liquor License Comm'rs for Balt. City,* 255 Md. App. 35, 60 (Md. App. 2022)(citing *Murphy v. Edmonds,* 325 Md. 342, 353-43, 601 A.2d 102 (1992); *Hargrove v. Bd. of Trs.*, 310 Md. 406, 416, 529 A.2d 1372 (1987)); *see also Manikhi v. Mass. Transit Admin.,* 360 Md. 333, 361, 758 A.2d 95, 110 (2000).

53. Prince George's County and/or the Prince George's County Police Department have *respondeat superior* liability for Defendant Nelson's violation of Plaintiffs' rights secured by Article 24 of the Maryland Declaration of Rights.

WHEREFORE, Plaintiff demands economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by law.

COUNT V
FIRST AMENDMENT RETALIATION
42 U.S.C. § 1983
(Acosta v. Aziz, Ramos, and Nelson)

54. Plaintiff incorporates the previous allegations in paragraphs 1 through 35 as if restated herein verbatim.

55. Citizens do not surrender their First Amendment rights by accepting public employment. *Lane v. Franks,* 573 U.S. 228, 231 (2014). A public employee's free speech rights are limited only to accommodate their employer's valid interest in controlling the workplace. *Pickering v. Board of Education,* 391 U.S. 563 (1968). Accordingly, a public employee's speech

is deserving of First Amendment protections when the speech involves a matter of public concern. *Lane,* 573 U.S. at 237. Speech involves a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps,* 562 U. S. 443, 453 (2011). The inquiry turns on the "content, form, and context" of the speech. *Connick v. Myers,* 461 U. S. 138, 147-148 (1983).

56. "The First Amendment also 'prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett,* 139 S.Ct. 1715, 1722 (2019)(quoting *Hartman v. Moore*, 547 U. S. 250, 256 (2006)). If an official takes adverse action against someone based on that forbidden motive, and "nonretaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim. *Id.; see also Crawford-El v. Britton,* 523 U. S. 574, 593 (1998); *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U. S. 274, 283-284 (1977).

57. Acosta's complaints to the EEOC regarding Nelson's discrimination against him because of his race constituted both a matter of public concern (*i.e.,* racial discrimination by a high-ranking officer within the PGPD) and speech protected by the First Amendment.

58. Nelson and Ramos became aware of Acosta's complaints to the EEOC in late May or early June, 2024.

59. Although Acosta was placed on administrative suspension with pay in mid-July after an argument with his ex-girlfriend, the ex-girlfriend soon recanted her allegation of domestic abuse and Nelson and Ramos were aware she had recanted her statement.

60. Ramos also knew that she lacked probable cause to pursue criminal charges against Acosta for animal abuse after presenting her evidence to ASA Patterson and being informed that the State's Attorney's Office would decline to seek charges against Acosta.

61. Notwithstanding this knowledge, with the assistance of Nelson and approval from Aziz, Ramos did an end-run around the State's Attorney's Office by seeking criminal charges against Acosta on her own through a Commissioner. In doing so, Ramos intentionally made materially false statements to the Commissioner as described herein.

62. Given the close proximity between Acosta's protected speech and Ramos's actions notwithstanding her knowledge that criminal charges were unsupported by sufficient evidence, it is reasonable to conclude that the Defendants were motivated by retaliation for Acosta's protected speech. Defendants acted with actual malice towards the Plaintiff in that Defendants' actions properly may be characterized by evil or wrongful motive, an intent to injure, knowing and deliberate wrongdoing, and ill will towards the Plaintiff.

WHEREFORE, Plaintiff demands economic, noneconomic, and punitive damages against the aforesaid defendant, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by 42 U.S.C. § 1988.

## COUNT VI
### RACE AND/OR NATIONAL ORIGIN DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII
### 42 U.S.C. § 2000e
(Acosta v. Aziz, Ramos, and Nelson)

63. Plaintiff incorporates the previous allegations in paragraphs 1 through 35 and 54 through 62 as if restated herein verbatim.

64. Title VII of the Civil Rights Act of 1964 bars employers from discriminating on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

65. Section 704(a) of the Act also expressly prohibits retaliation by an employer against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

66. As set forth in this Complaint, Nelson discriminated against Acosta on the basis of his race and/or National Origin.

67. Furthermore, the Defendants were all aware of the EEOC investigation and that Acosta had been interviewed by an EEOC investigator and was assisting with the EEOC investigation.

68. In retaliation for this, Acosta was charged criminally even though the Defendants knew there was insufficient evidence to support a probable cause finding as determined by ASA Patterson. In doing so, Defendants acted with actual malice towards the Plaintiff in that Defendants' actions properly may be characterized by evil or wrongful motive, an intent to injure, knowing and deliberate wrongdoing, and ill will towards the Plaintiff.

69. As a direct and proximate result of the discrimination and retaliation, Plaintiff suffered loss of income, suspension from employment without pay, humiliation, distress, embarrassment, great expense, and damage to his reputation.

WHEREFORE, Plaintiff demands economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by law.

## COUNT VII
## ARTICLE 40 RETALIATION
(Acosta v. All Defendants)

70. Plaintiff incorporates the previous allegations in paragraphs 1 through 35 and 54 through 62 as if restated herein verbatim.

71. Article 40 of the Maryland Declaration of Rights provides State Constitutional protections *at least* coextensive with the First Amendment of the United States Constitution. *DiPino v. Davis,* 354 Md. 18, 43, 729 A.2d 354, 367 (1999)(citing *Jakanna v. Montgomery County,* 344 Md. 584, 689 A.2d 65 (1997)).

72. Article 40 of the Maryland Declaration of Rights provides that "the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." Importantly, Article 40 is capable of a different interpretation than the First Amendment. *Clear Channel Outdoor v. Dep't of Fin.,* 472 Md. 444, 457 (2021); *State v. Brookings,* 380 Md. 345, 350 n.2 (2004)(the Maryland Supreme Court has "emphasized that, simply because a Maryland constitutional provision is *in pari materia* with the federal one . . . does not mean that the provision will always be interpreted or applied in the same manner as its federal counterpart.")(citing *Dua v. Comcast Cable,* 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002) and *DiPino v. Davis,* 354 Md. 18, 43, 729 A.2d 354, 367 (1999)("In certain contexts the contours of the State Constitutional rights are not precisely those of the Federal.").

73. As explained above, the First Amendment has been interpreted to protect the speech of government employees only when their speech is a matter of "public concern" and the government lacks an adequate justification for treating the employee differently from the public at large. The language of Article 40 "that *every citizen* of the State ought to be allowed to speak,

16

write and publish his sentiments *on all subjects*," suggests broader application in which one's employment status is irrelevant, and protections apply not only to matters of public concern, but also to matters of private concern, *i.e.,* "*on all subjects*." Article 40 (emphasis added).

74. For the same reasons the Defendants violated the First Amendment they also violated Article 40. In doing so, Defendants acted with actual malice towards the Plaintiff in that Defendants' actions properly may be characterized by evil or wrongful motive, an intent to injure, knowing and deliberate wrongdoing, and ill will towards the Plaintiff.

75. Prince George's County and/or the Prince George's County Police Department have *respondeat superior* liability for Defendants' violations of Plaintiff's rights secured by Article 40 of the Maryland Declaration of Rights.

WHEREFORE, Plaintiff demands economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by law.

### COUNT VIII
### DEFAMATION
(Acosta v. AZIZ and Ramos)

76. Plaintiff incorporates the previous allegations in paragraphs 1 through 35 as if restated herein verbatim.

77. Defendant Ramos, with the knowledge and approval of Aziz, intentionally accused Acosta of committing criminal acts, including felonies, when the Defendants knew or should have known that the allegations of criminal misconduct were unsupported by probable cause and defamatory *per se*.

78. Aziz held a news conference immediately after Ramos obtained criminal charges against Acosta and publicly defamed Acosta in the news media, proclaiming his "disgust" with

17

Acosta and calling Acosta's behavior "appalling," all the while knowing Acosta was innocent, or at least having knowledge that the State's Attorney's Office had declined prosecution for lack of sufficient evidence of any criminal conduct.

79. Ramos and Aziz knew their allegations about Acosta were false and that Acosta was innocent of wrongdoing and therefore they made false statements about Acosta knowingly and with actual malice towards the Plaintiff in that Defendants' actions properly may be characterized by evil or wrongful motive, an intent to injure, knowing and deliberate wrongdoing, and ill will towards the Plaintiff.

80. Alternatively, Aziz and Ramos negligently made false and defamatory statements about Plaintiff that they should have known were inaccurate.

81. As a result of the false and defamatory statements made by the Defendants, the character and reputation of Plaintiff was harmed, his standing and reputation within the law enforcement community was impaired, and he suffered mental anguish, financial hardships, embarrassment and personal humiliation.

WHEREFORE, Plaintiff demands economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by law.

COUNT IX
MALICIOUS PROSECUTION
(Acosta v. Aziz, Ramos, and Nelson)

82. Plaintiff incorporates the previous allegations in paragraphs 1 through 35 as if restated herein verbatim.

83. As set forth herein, Ramos, with the knowledge and approval of Aziz, caused criminal charges to be filed against Acosta notwithstanding the State's Attorney's Office had

declined prosecution and informed Ramos she lacked sufficient evidence to support criminal charges against Acosta.

84. In doing so, Ramos made the materially false statements alleged to mislead the Commissioner, who charged Acosta with criminal acts occurring at "13409 Dille Drive, Upper Marlboro, Maryland," when Ramos clearly knew the alleged misconduct, if it occurred at all, did not occur at 13409 Dille Drive, but instead would have occurred in Waldorf, Charles County, Maryland.

85. As a result of the criminal charges, Acosta was suspended without pay, denied pay and benefits, required to attend court proceedings to answer the criminal charges, and was restricted in his travel. Additionally, Acosta's personal and professional reputation was destroyed.

86. As described more fully herein, the Defendants acted with actual malice and without probable cause to believe any crimes had been committed by the Plaintiff. The Defendants secured criminal charges by making, causing to be made, and/or approving false and misleading statements to the Prince George's County Commissioner.

87. The Defendants' actions in bringing about the prosecution of Plaintiff was committed with actual malice towards the Plaintiff in that Defendants' actions properly may be characterized by evil or wrongful motive, an intent to injure, knowing and deliberate wrongdoing, and ill will towards the Plaintiff.

88. All criminal charges against the Plaintiff were dismissed on October 18, 2024.

89. As a direct and proximate result of the malicious prosecution of the Plaintiff alleged in this Complaint, the Plaintiff was suspended without pay, made ineligible for promotion or transfer opportunities within the police department, faced an unwarranted criminal prosecution, was restricted in his travel, and suffered humiliation, embarrassment and great mental anguish.

WHEREFORE, Plaintiff demands economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by law.

## **DEMAND FOR JURY**

90. The Plaintiff respectfully demands trial by jury.

January 7, 2025                                                  Respectfully Submitted,

/s/Ray M. Shepard\
Ray M. Shepard, Bar No. 09473\
The Shepard Law Firm, LLC\
122 Riviera Drive\
Pasadena, Maryland 21122\
Phone: 410-255-0700\
Facsimile: 443-773-1922\
Email: Ray@Shepard.Law

C*ounsel for Plaintiff David M. Acosta*